FOURNET, Chief Justice
(dissenting).
The author of the majority opinion, in concluding that only a question of fact is involved in this case and it is therefore unnecessary to state the pleadings, overlooks the fact that the sole function of pleadings is to bring the case to issue. It is the method prescribed by law for fully disclosing the nature and scope of the controversy, from which the issues are drawn, and they also serve as the guide post for the judicial determination of the evidence that is admissible. It therefore follows that in order to properly evaluate the evidence in this record, the pleadings must be set out.
The petition is rather lengthy and detailed, containing 29 articles, and, in addition, 35 interrogatories that were addressed to the defendant are annexed. These allegations are, substantially, that in May of 1939 Mrs. Devron and her daughter, Mary Ursula, then engaged to marry the defendant, Charles Thereon Goesling, a salesman without assets other than a salary of approximately $160 a month, were living in a rented home (apartment) at 7026 South Claiborne Avenue in New Orleans, Louisiana, and that she wished to purchase a home (Articles I, II, III), but that the defendant prevailed upon her not to do so, and, instead, to purchase a lot and build a home and to let him handle the entire transaction, including the financing of the construction, since “he was a man and claimed to be better able to handle the details and arrangements” (Article IV); that relying on these representations “petitioner agreed to put up the sum of $10,-000 for the purchase of the lot and the building of a home, and * * * to pay the amount of the mortgage loan necessary for the completion of said building costs * * * and defendant * * * agreed to execute a formal act of sale in favor of petitioner within a period of six (6) months from the date of his acquisition.” (Article V) Pursuant to this agreement, she alleges, a desirable lot was found, the improvements on which bear municipal number 5535 South Claiborne Avenue, and was purchased from the Bernard Company, Inc., on June 6, 1939, with the $5,000 she advanced to defendant in May of 1939 (Article VII); that she secured plans and specifications and entered into a contract with Bert Wilson for the construction of a home on this lot, using the defendant only as a nominal party, and that she made all changes in these plans, advancing defend *68 ant, in November of 1939, “the further sum of $5,000 to be paid by him to the contractor” (Article VIII), the remaining amount needed for the construction of the home being secured on November 29, 1939, after its completion, by first mortgage from the Prudential Life Insurance Company, she using the defendant as a nominal party in this transaction also, but agreeing herself to pay all of the installments of $59.40 monthly, as well as “the taxes, insurance, lights, gas, gardening, and upkeep” (Article IX) ; and that delivery of the house was made to her and she moved into it and furnished it. (Article X.)
Mrs. Devron further alleges that the defendant, who had been traveling in New York since February of 1940, returned to New Orleans shortly after he married her daughter in October of 1940 and “at his suggestion agreed to move into the home,” paying her $40 a month as room and board for himself and his wife (Article NH) 1 that during the years 1940-1945 she called upon the defendant on numerous occasions to transfer the property to her, to no avail, defendant declaring it was unnecessary since he was married to her daughter and the property would go to his wife upon his death, and that to further delay the transfer of the property and to serve as an excuse for his failure to comply with his obligation, the defendant turned over to petitioner an olographic will he had executed leaving the property to her daughter (Article XIII), and that relying upon these fraudulent representations and in order to keep peace and harmony in the family, she continued to pay the monthly mortgage installment of $59.40, “the taxes, insurance, lights, gas, furnishings, gardening, etc.” (Article XIV) until on or about 'July 15, 1945, when the defendant and petitioner’s daughter were undergoing serious marital difficulties, at which time he began “to pay these expenses for the first time,” and again represented to her that her daughter was part owner of the home and there would be no advantage in transferring title to her; and that she would lose nothing in the transaction for if “things didn’t work” out between him and his wife, he would transfer- the property to her (Article XV), alleging further that she continue to reside in the home, taking no legal action because of a desire not to destroy the marriage, but that she did again demand in 1948 that he transfer formal title to her, at which time he refused, stating he would put her out of the house (Article XVI), and that, finally, after the marital situation reached such a stage that her daughter and the defendant consulted an attorney, she was ordered to leave the house on November 2, 1948, and she did, taking her furniture with her but later returning it upon the request of the defendant, and permitting it to remain there until January 11, 1949, when she moved it out the second time (Article XVII). In Articles XIX, XX, and XXI the petitioner alleges this house and prop *70 erty is worth $40,000; that she is entitled to have the defendant comply with his agreement to transfer the title to her; and that she stands ready and willing to pay in full the amount remaining due on the mortgage. She requests permission to propound to the defendant the 35 interrogatories on facts and articles annexed to her petition.
In the alternative, Mrs. Devron alleges she is entitled to an accounting of all of the monies she advanced to the defendant (Article XXII) and in support of this claim she realleged and reiterated each and every one of the foregoing allegations, the same as though they were copied in extenso. (Article XXIII.)
In the remaining articles of the petition, Mrs. Devron lists the amounts she claims she is entitled to recover. These total $19,-929.26, and, as broken down by her, are: $10,000, money advanced for the purchase of the lot and the construction of the house; $4,049.20, representing monthly payments allegedly made on the mortgage loan during all of the months from December of 1939 through July of 1945; $1,876.35, taxes allegedly paid on this house by her from 1940 through 1945; $243.07, insurance paid by her on the house; $509.12, lights, gas, and water; $2,851.11, repairs, gardening, and miscellaneous items; and $410.41, telephone service. (Articles XXIV, XXV, XXVI, XXVII, and XXVIII.)
Numerous exceptions were filed, but they are not at issue here and therefore will not be discussed. In his answer to the interrogatories and also the petition, the defendant categorically denied that the plaintiff had advanced him any money for the purchase of a lot and the construction of a home; that the property had been .placed in his name for convenience only and that he had agreed to transfer it to the plaintiff within six months after its completion; that the plaintiff had secured the plans and specifications for the construction of the house, had employed the contractor to build it, had made any changes in the plans, or had completely furnished the house. He averred the plaintiff had moved into the house after its completion under a rental agreement whereby she was to pay the monthly amount due on the mortgage, as well as all taxes 'and insurance that might subsequently become due, utilities and gardening. He denied she had made repeated demands for the transfer of the property from 1940-1945, and particularly on July 15, 1945, or that he ever told her it was not necessary to transfer the property to her since he was married to her daughter and it would go to the daughter upon his death. He did state, however, that the only demand made for the transfer of this property to the plaintiff was in November of 1948, after an attorney had been consulted by her and companion documents drafted, one purporting to be an agreement by the defendant *72 to transfer to the plaintiff all his right, title, and interest in the property (P-17), the other purporting to be an agreement to settle all marital difficulties between the defendant and his wife (P-18), at which time he refused, and, recognizing the plaintiff to be the source of all of the trouble and dissension in his home, ordered her to leave. He further stated the only other time a change in the title to the property had even been mentioned was in 1941, following his mother’s death, when the plaintiff, because of her dislike for his father and her fear that he might be entitled to share in the defendant’s estate, asked him to put the title to the property in the joint names of the plaintiff, her daughter, and the defendant, but that he refused to do this, though he did, at this time, execute an olographic will leaving the property to his wife because their daughter had not, at that time, been born.
In reconvention the defendant sought to recover the value of a new Norge refrigerator purchased by him in December of 1948 and moved out of his home by Mrs. Devron the next month, as well as the value of a dining room set purchased by him October 2, 1939, another purchased by him in 1947, and the value of the furniture the plaintiff sold him in November of 1948 and on which he had made partial payment of $100 when she took this too. The total of this claim is $921.
Inasmuch as title to real estate can be established by parol testimony only where it is confessed under interrogation on oath, Article 2275 of the Revised Civil Code, and the defendant’s denial in his answer to interrogatories that the house had been put in his name for convenience only and with the understanding the title would be transferred to the plaintiff after its completion was fatal to the main demand under our settled jurisprudence, Godwin v. Neustadt, 42 La.Ann. 735, 7 So. 744; Franton v. Rusca, 187 La. 578, 175 So. 66; Scurto v. Le Blanc, 191 La. 136, 184 So. 567; Fontenot v. Ludeau, 191 La. 540, 186 So. 21, counsel for the plaintiff formally abandoned the main demand at the beginning of the trial, announcing to the court that all of the evidence being introduced was for the purpose of establishing the alternative demand for an accounting of the monies the plaintiff allegedly advanced the defendant for the purchase of the lot, the construction of the house, and also for payments she had made on the mortgage loan, for utilities, gardening, insurance, and taxes. (Tr. 58.)
The case went to trial on these issues. At its inception the defendant objected strenuously, as he had done at the time of the propounding of the interrogatories, to the introduction of all testimony that was immaterial and irrelevant to the issues involved, and particularly to the introduction of any evidence that was beyond the pleadings. This objection was made general to all testimony and evidence. The court *74 assured him he would not permit the pleadings to be enlarged.
When the case was called for trial, Clayton V. Setze, an employee of the National American Bank (formerly the American Bank & Trust Company) in court in response to the defendant’s siibpoena duces tecum, was the. first witness to take the stand. He produced two drafts, drawn by the American Bank & Trust Company on the Chemical Bank & Trust Company of New York, both payable to Terry Goesling, the defendant, one, in the amount of $6,-000, dated June 5, 1939 (D-8), and the other in the amount of $4,000, dated July 13, 1939 (D-10), the checks showing on the reverse side they had been deposited to the account .of Terry Goesling in the Whitney Bank on the same day .on which they had been issued, that is, June 5 and July 13, 1939 respectively. (Tr. 51, 52.) He also produced the bank’s ledger showing the record of drafts it had drawn on the Chemical Bank & Trust Company, that established these checks had been purchased by Macrino Trelles. (D-12 and D-13.) (Tr. 52, 53.) The ledger sheet is set up thus:
Date Payable to the Order of By Whom Purchased No. Amount
Jun 5 1939 Terry Goesling Macrino Trelles 19 $6,000
‡ % í¡< íjc s{í ;¡í ;{i
Jul 13 1939 Terry Goesling Macrino Trelles ' 55 $4,000
He produced, further, the ledger sheet of the account of Macrino Trelles with the bank, showing that on June 5, 1939, his account had been debited in the amount of $6,000, and that on July 13, 1939, his account had been debited in the amount of $4,000 (D-ll) (Tr. 53, 54.)
The plaintiff, confronted with this damaging evidence and realizing her dilemma, called the defendant to the witness stand and subjected him to a .prolonged and severe cross-examination that lasted throughout the remainder of the morning and far into the afternoon, but was fruitful of no evidence that was contrary to or varied in any respect the defendant’s answers as formerly given to the interrogatories and to the petition. The following day the plaintiff took the stand in her own behalf and in an effort to establish her claim related a most fantastic story. I say the story is fantastic for the simple reason that it is not supported by a scintilla of evidence on a most crucial point and it is completely impeached in another very important aspect.
She had obviously been apprized of the fact that in order to prevail her proof had to be within the allegations of her petition, and so she testified this $10,000 had been given to her by Mr. Trelles and that she had, in turn, given it to the defendant. To explain the manoeuvre whereby this had been accomplished, in the face of the in *76 disputable evidence of the bank records showing that Trelles had purchased these checks for the defendant, she stated that after the defendant “had obtained the lot, or it was agreed to buy the lot — I don’t know how you would state it — he (Goes-ling) came to the house that evening and he said‘Pud (the nickname by which she was known), we are going to pass the act of sale; I have bought the lot; and will you ask Joe (the nickname by which Trelles was known) for the money’? And I said: 'I will contact him tomorrow.’ And he said: 'You ought to do this: ask him to give you a check amd then have it made in New York exchange in my name. That way * * * they won’t know where the money came from’.” Accordingly, she says she called Trelles the next morning and he came to her office at noon and handed her a check for “either five or six — frankly, it was six thousand dollars. I thought it was two fives, but it was six * * * and he asked me to purchase New York Exchange checks.” She further explains that the check given her that day by Trelles was his personal check payable to cash. (Tr. 149.) She bought this bank draft, or cashier’s check, took it home, and gave it to the defendant in the presence of her daughter, Ursula. (Tr. 150.) (Emphasis and brackets added by me.)
In answer to further questioning as to whether she had received any additional money from Trelles, she stated: “Yes I don’t know whether it was in the course of the construction of the house or whether the house was completed, but I know Terry . (the nickname by which the defendant, Goesling, is known) came to me and he said: 'Pud, I need the balance of the money that you are to get from Joe, and we will need it tomorrow.’ So I again called Mr. Trelles and we went through the same procedure with the check” (Tr. 152), that is, he gave her his personal check payable to cash, this time in the amount of $4,000.; that she took this check payable to cash to the American Bank & Trust Company -and there purchased a cashier’s check or banker’s draft in the amount of $4,000 payable to Terry Goesling, which she took home with her and gave to Terry in the presence of Ursula that afternoon. (Tr. T53.) (Emphasis and brackets added by me.)
The plaintiff hag no corroboration whatsoever to substantiate this phase of her story. There is not an iota of evidence in the record to support her testimony that Trelles ever gave her his two personal checks payable to cash in the amounts of $6,000 and $4,000, either in May and November of 1939, .as she alleged, in June and July of 1939, as the defendant proved were given to him, or, for that matter, at any other time. If such checks ever did in fact' exist, the plaintiff should have produced them, or at least have produced some evidence of their existence, and, in the absence of this, have made at least a showing .of why she was unable to do so, for her cause must be won or lost on the establish *78 ment of the fact that Trelles did, in fact, give her these checks.
The failure of the plaintiff to produce or account for the absence of written evidence of a transaction involving such a large sum of money, and more particularly where these were subpoenaed, creates the presumption that these contemporaneous writings, if produced, would be prejudicial to her cause and conclusive of her opponent’s. Crescent City Ice Co. v. Ermann, 36 La.Ann. 841; Hannay v. New Orleans Cotton Exchange, 112 La. 998, 36 So. 831; Navarette v. Laughlin, 209 La. 417, 24 So.2d 672. See, also, Bates v. Blitz, 205 La. 536, 17 So.2d 816; Succession of Yeates, 213 La. 541, 35 So.2d 210, and the authorities therein cited. We must conclude, therefore, that these cash checks never existed, and, further, that if the actual checks with which the two bank drafts were purchased had been produced, they would have revealed, as did the bank records, that Macrino Trelles himself purchased them. This is particularly true in view of the fact that among these ¡bank records' is a statement of Macrino Trelles’ bank account, showing debits for these identical amounts on the very days the drafts were procured.
The plaintiff not only made no effort to produce these checks or any evidence of their existence, or to give any reasonable explanation for her failure to do so, but the manner in which her entire case was conducted — that is, the allegations of her petition, her interrogatories to the defendant, her questions propounded to Macrino Trelles by deposition, and her cross-examination of the defendant under the rule — belie her present position, which is obviously a belated fabrication confected in an effort to meet the issues cast by her, and also to overcome the damaging effect of this documentary evidence.
It is only reasonable to assume that- if such checks were issued by Trelles and given to her by him, as she says, being represented by able and astute counsel, she would at least have asked Trelles if this was not the case, and, if so, to produce these cancelled checks. However, an examination of the questions she propounded to him in her deposition shows clearly she asked no such questions, that she was not trying to establish that he issued them or .that they existed, or, for that matter, that she had any such thought or idea in mind at that time. The following are the only questions propounded to him on this subject:
Interrogatory No. 25: “Did you not in April or May, 1939, turn over to Mrs. Lena Devron a cashier’s check drawn'on a New York Exchange in the amount of $5,000?’’
Interrogatory No. 27: “Please state whether in October or November, 1939, you turned over to Mrs. Lena Devron another cashier’s check drawn upon a New York Bank Exchange in the •amount of $5,000 * # *
*80 Interrogatory No. 28: “Please state whether or not these two cashier’s checks were turned over by you to Mrs. Lena Devron as payment to her in full?” (Emphasis has been added by me.)
Furthermore, Trelles’ answers to these questions add nothing to plaintiff’s cause. In answer to Interrogatory No. 25, he said: "/ don’t remember about making a check.” When asked on cross-interrogatory that if his answer to this question was in the affirmative (it is obvious that it is not) to produce such cashier’s checks and state to whom they were made and by whom purchased. He replied: “There is no such thing. I can’t produce nothing.” To Interrogatory No. 27 he said: “7 don’t remember that. I thought it was already by that time liquidated.” And while in answering Interrogatory No. 28 Trelles states: “Yes. Yes. Paid in full,” when he was cross-examined on this question thus — '"Isn’t it true that you never gave Mrs. Devron either of these cashier’s checks she says you gave her?” —he replied: "I don’t remember that.” (Emphasis has been added by me.)
If this devious procedure was indeed intended to hide the source from which the money had been secured, as the plaintiff stated, it is quite clear that, like most people who tell stories, she slipped up badly, for she overlooked the fact that for her to have cashed or negotiated these checks at the bank in purchasing the bank drafts, it would have been necessary for her to endorse them, and a check payable to cash and endorsed by her might just as well have been made in her name. Further, if she was trying to cover up where the money came from, what could have been her reason for telling the bank, as she claims she did with respect to the $4,000 check, that she was purchasing this particular check for Macrino Trelles? (Tr. 153.) In addition, it is apt to point out here that while she says on page 149 of the transcript Trelles told her to buy these bank exchange checks, on page 150 she says the defendant told her to buy them.
In an attempt to corroborate that part of her story that would tend to establish it was she who gave these chashier’s checks to the defendant, and not Trelles, the plaintiff produced the testimony of her daughter, Ursula, the defendant’s estranged wife, who testified in unison with her mother. Ursula stated that her mother “gave Terry Goesling a check one evening after work (according to Ursula this was between 6 and 7 in the evening — (Tr. 131), in the dining room -at 7026, in my presence. * * the amount of the check would be whatever we paid for the lot. It was either four or five thousand dollars. And if it was four thousand, the check was for four, and if the lot was five thousand, the check was for five.” To make her testimony more positive, and without even being questioned in this respect, she stated: "7 saw the check, but you know, checks are different colors and so on and so forth. I couldn’t tell you what color of check it was. But we were *82 expecting a check and I knew it was that.” (Tr. 123 and 124.) She stated further that her mother turned over this check to Terry Gocsling when the lot was purchased in May of 1939. Her testimony is, additionally, that she was present when the second check was given to the defendant: “During the completion of the house, or the house zvas completed, I can’t remember zvhich, but 1 do remember her giving him the balance of the money, because 1 even remember him telling her to be sure to get it, because we would need it.” (Tr. 124.) (Emphasis added by me.)
The indisputable documentary evidence in this record so completely refutes and impeaches the testimony of the plaintiff and her daughter on this phase of the case, they are totally discredited as witnesses. Obviously they failed to notice that the two drafts, just previously introduced in evidence, disclosed, on the reverse side, that they had been deposited to the defendant’s account in the Whitney Bank on the same day on zvhich they had been issued. Furthermore, after they testified, M. J. Van Gesfen, an official of the Whitney Bank, in court under the defendant’s subpoena, produced the defendant’s original deposit slips (Whitney-I and Whitney-II) showing that two bank exchange drafts, one for $6,000, issued June 5, 1939, and the other for $4,-000, issued on July 13, 1939, had been deposited to the defendant’s bank account on the dates of issuance. In addition, the defendant introduced his personal bank statements (D-9 and D-14), showing, as conr firmation and corroboration of his testimony and as further refutation of the testimony of the plaintiff and her daughter, that these amounts ‘had been credited to his account on these two days. This documentary evidence unmistakably shows that it was a physical impossibility for the plaintiff to have had these checks in her possession after banking hours on these days, as sworn to by her and her daughter.
The plaintiff and her daughter are further impeached with respect to the delivery of the $4,000 check to the defendant in person on the afternoon of July 13, 1939, for there are in the record a series of letters showing the defendant, as he had testified, was not in the city on that date, and Exhibit D-15 conclusively establishes, by its postal cancellation, that on July 13, 1939, he was actually in Shreveport, Louisiana.
An analysis of the testimony offered by the plaintiff to explain the motive or consideration for Trelles giving her $10,000 adds very little, if anything, to her cause. She testified she was employed by Trelles in 1932 to manage a 300 acre farm owned by him in Mississippi known as the Old Clark Plantation. The record shows there was one badly run-down house on this place (Tr. 113), that the place was farmed by one sharecropper (Tr. 175), and that Trelles was paying for' the work done by this sharecropper. (Answer to Cross-interrogatory No. 7.) Two mules on the place belonged to Trelles, while the remaining live *84 stock, consisting of some cows and chickens, belonged to the sharecropper. (Tr. 174.) For her services Mrs. Devron testified she was to receive her expenses and if she “put the place back cm a paying basis, he would give me a stipulated sum, he would pay me a certain percentage on the place * * * I was working at the time and trying to put it on a paying basis, and as soon as it was, he would reimburse me for my effort.” .(Tr. 144 and 145.)
To explain the services she was rendering, she stated: “In the beginning of the year, I went at least'once every two weeks until March. Then the crops were under way and .1 didn’t have to go back until summer time, but I kept a correspondence. And then, in the fall, I had to go and see that the cotton was picked and corn was brought in. And at the end of the year, I had to return to make the necessary arrangements to sign the contracts.” (Tr. 144.) Significantly, Ursula, testifying in an attempt'to corroborate her mother, stated she (Ursula) and not her mother “took care of all the correspondence” (Tr. 113), and that her mother’s duties, among others, consisted of planting tung oil trees, work Mrs. Devron does not even claim to have done and that would appear to have been done by Trelles’ son after the termination of the plaintiff’s services. (Emphasis added by me in the two foregoing paragraphs.)
. While Mr. Trelles did admit he employed ■Mrs. Devron to manage this farm (answer -to Interrogatory No. 7), and that as compensation he had agreed to pay her expenses (answers to Cross-interrogatory No. 8 and Interrogatory No. 10), an examination of his testimony unmistakably shows the place was never put on a paying basis (answer to Cross-interrogatory No. 9), although according to her own testimony, this was the only basis under which she was to receive, as she terms it, a special “percentage” payment. (Tr. 144, 145.)
Mr. Trelles stated further, in answer to Cross-interrogatory No. 11, that the plaintiff had been employed under a power of attorney executed by John E. Jáckson, an attorney of this city — a fact never referred to in her testimony. However, despite this disclosure by Trelles that Mrs. Devron was working under a written contract of employment, it was never produced during the trial, no explanation was given for the failure to produce it, and the attorney who drew it up was not called as a witness to establish its contents or to produce a copy. Instead, Mrs. Devron sought to establish that she had been working under a verbal agreement, for she asked Trelles, in Interrogatory No. 13, “Please state whether'you had any verbal agreement with Mrs. Devron for the payment of any sum' of money to her in the event she was successful 'during her management in placing the Old Clark Plantation on a paying basis.” Trelles had just stated in answer to Cross-interrogatory No. 9 the place was never put on a paying basis, and while he answered Interrogatory -No. 13 “yes,” when asked in Cross-inter- • rogatory 14(f) : “Isn’t it true that you were *86 never under any financial obligation at any time to pay Mrs. Devron $10,000 or any part of it,” he replied: "I never owed her my financial obligation.” (The emphasis has been added by me.)
It would appear logical that the plaintiff, to rebut this testimony, which was clearly adverse to her cause, would have produced the written power of attorney under which Trelles stated she had been employed; by failing to produce it, to account for its loss, or to prove its contents, she creates the presumption that this power of attorney, if produced, would disclose facts that would be detrimental to her cause, under the well established rule of evidence just above referred to.
Finally, another of the inconsistencies found in the testimony of Trelles, and one that is particularly damaging to the plaintiff’s cause, is his answer to Interrogatory No. 22. In this interrogatory the plaintiff asked him the specific question: “Did the said Charles Thereon Goesling suggest to you at any time that the $10,000 which you had agreed to pay to Mrs. Devron be used for the purpose of the vacant lot on South Claiborne Avenue and for the partial payment of the house to be erected thereon?” In answer thereto, he not only did not admit the defendant ever made such a suggestion, but stated: “IN THE FIRST PLACE I NEVER GAVE HER THAT $10,000. Yes, she told me about buying the lot there, BUT WITH WHAT MONEY?” (Emphasis added by me.)
My learned colleague, the author of the majority opinion, has seen fit to completely ignore these most revealing facts, although they were called to his attention orally and in brief. He does nothing more than brush them aside in a summary fashion with the bare statement: “The defendant makes much of discrepancies in the plaintiff’s testimpny,” followed by the observation “We find discrepancies in the defendant’s testimony also,” but not pointing to a single one — since he cannot' — as the basis for such a statement. In his opinion he concludes, also without assigning any reason, that “there is a reasonable explanation why the transaction was handled in this manner,”— that is, why the two cashier’s checks were procured. In fact, it is apparent that in writing the entire opinion he has chosen to trek the pattern confected in the briefs submitted by the plaintiff, where the case is dealt with in generalities only' — in a way that might well be characterized as a Mother Hubbard — it 'seemingly covers the subject, yet the vital points are untouched or obscured.
It is eminently clear that the plaintiff has totally failed to carry the burden of establishing her claim, which, being in excess of $500, must be proved “at least by one credible witness, and other corroborative circumstances.” Article 2277 of the Revised Civil Code. See, also. Succession of Gesselly, 216 La. 731, 44 So.2d 838, and Fleury v. Ramos, 218 La. 293, 49 So.2d 17.
*88 As above demonstrated, Mrs. Devron and her daughter have been completely discredited as witnesses, and she has produced no corroborative evidence to aid her. In her sworn allegations she cast the die from which the issues in this case must be drawn. The right to select the theory under which she chose to establish a claim against this defendant was entirely her own. She must stand or fall on that cause of action as presented; she cannot recover on implications and innuendoes. Shautin v. Board of Commissioners, 160 La. 1036, 107 So. 897. She had the burden of making her claim legally certain; to make it probable was not sufficient. Jackson & Anderson v. Beling, 22 La.Ann. 377; Dreher v. Guaranty Bond & Finance Co., 184 La. 197, 165 So. 711, and the authorities therein cited. For this reason, in determining whether she has sustained the burden of proof, the court cannot resort to conjectures, probabilities, suppositions, or other mental ratiocinations. Wallar v. Southern Pacific Co., D.C., 37 F.Supp. 475; Kentwood Lbr. Co. v. Illinois Central Railroad Co., 5 Cir., 65 F.2d 663; Defries v. Batesville White Lime Co., 198 Ark. 986, 132 S.W.2d 169; Lowden v. Van Meter, 181 Okl. 210, 73 P.2d 424; Wyatt v. Chosay, 330 Mich. 661, 48 N.W.2d 195; Mt. Olive Mfg. Co. v. Atlantic Coast Line R. Co., 223 N.C. 661, 65 S.E.2d 379; Cupples Co. Manufacturers v. National Labor R. Bd., 8 Cir., 106 F.2d 100; Home Ins. Co. of New York v. Northern P. R. Co., 18 Wash.2d 798, 140 P.2d 507, 147 A.L.R. 849; and Tyson v. Utterback, 154 Miss. 381, 122 So. 496, 63 A.L.R. 1188. From the foregoing analysis of the evidence in this record, it is obvious the plaintiff has completely failed to discharge her burden of proof, the more particularly so since our law specifically sets out the amount of proof necessary to establish a claim involving this large amount of money. Article 2277, supra.
On the other hand, the observation in the majority opinion to the contrary notwithstanding, it might be well to observe at this point that the defendant’s version (only meagerly given in the majority opinion) of his acquisition of this lot and the construction of this house, as well as the conditions under which the plaintiff moved into it under a rental agreement, has not been impeached or successfully contradicted in any material aspect. I have found no discrepancies in his testimony, and he lias never been successfully attacked or impeached as a witness. In fact, despite the cross-examination to which he was subjected in the interrogatories annexed to the petition and his cross-examination under the act for the greater part of the first day of the trial (Tr. 50-111), and the further fact fhat he was subjected to a most relentless and caustic cross-examination on his direct testimony by counsel apparently employed for the specific purpose of cross-questioning him and all of his witnesses — he does not appear of counsel until the trial of the case and this is the only evidence of his participation in the trial in the lower court — that *90 lasted another day and a half (Tr. 252-348), he has been fully corroborated in all material respects by the indisputable documentary evidence and by the testimony of a totally disinterested witness; in many pertinent aspects he is also corroborated by Mrs. Devron, by her daughter, and by Mr. Trelles.
While it is true, as pointed out in the majority opinion, that Trelles, in answer to a series of leading questions propounded to him by counsel for the plaintiff, denied having given the defendant any money, his testimony as a whole, in answering 37 interrogatories and 64 cross-interrogatories, is entitled to little probative value. As above demonstrated, on the most crucial points of the case, he has made contradictory statements that have the effect of completely nullifying his testimony in these respects. In many others his answers weaken the testimony of the plaintiff, while in still others ■they impeach her, as will be again demonstrated hereafter in this opinion. Furthermore, many of his answers, when analyzed ,and considered with the remainder of the plaintiff’s testimony, furnish some of the links that forge an unbroken chain reflecting the plaintiff’s design on the property at 5535 S. Claiborne Avenue.
Trelles’ testimony appears to be very tevasive at times, lending credence to the impression he was endeavoring to cover up something. And the most charitable commentary that can be made on this testimony is that his memory had become obscured and faulty during the long siege of illness that had confined him to his home for a period of approximately five years at the time this case was tried. In any event, even in its most favorable aspects, Trelles does not in any wise contradict the documentary evidence involved in this transaction that had been in the custody of the banks during all of the intervening years and was produced by them at the trial, which shows that he procured the two bank exchange drafts payable to the defendant on June 5, and July 13, 1939. At no- place in his answers does he deny buying these two drafts, nor does he give any explanation of the manner of their procurement that would in any way contradict or vary this docu.mentary proof.
Mr. Trelles, a very wealthy manufacturer of the world-famed El Trelles Cigars, was, according to Mrs. Devrón and her daughter, a very charitable and most generous man. (Tr. 133, 143, 186.) The record reveals that after he met Mrs. Devron at his dentist’s office, where she was employed as an assistant from 1914-1943, in 1924, a close relationship developed between them that lasted until he was confined to his home by illness in 1945. During this period, and late in 1934, he became acquainted with the defendant, who was then courting the plaintiff’s daughter, and between them also a close and fast friendship developed that continued until Trelles was confined to his home in 1945. No one reading this record could fail to realize that the friendship be *92 tween the defendant and Trelles approximated the affection that exists between a father and a son.
I do not, as does the majority view, ascribe the defendant’s failure to visit Mr. Trelles during his long illness to ingratitude. I.do not think it would take a Solomon, after going over the record, to understand that neither the plaintiff, nor her daughter or son-in-law (the defendant), were social pets in the Trelles household. But if the plaintiff’s cause is to be weighed with gratitude as the measure, she, in my humble opinion, would wind up on the short end — for the record fails to disclose that she even inquired of her former benefactor’s well being, as did the defendant, after her hold on Trelles’ purse strings had been lost to her because of the ravages of his illness which made it impossible for him to drag his body to this home. On the contrary, she repaid him by, her actions in exposing facts to the public and involving him further in a manner that was no doubt embarrassing, if not mortifying, in the period just before his death — facts that, I am sure, his'widow and children would like to forget.
A perusal of the numerous letters the defendant addressed to his then sweetheart, Ursula, and that are to be found in the record, show that the defendant was at all times most solicitous of Mr. Trelles’ health and that without exception he always closed his letter by sending his love to “Joe and Pud.” In many of these letters he sends kisses to “Joe and Pud.” In one letter he asks Ursula to do him a special favor by giving “Joe” a big kiss for him. These letters, written at a most unsuspicious time, in some measure, at least, corroborate the defendant’s testimony that Mr. Trelles was the only man beside his father he ever kissed.
That Trelles and the defendant were most congenial, and that Trelles desired and sought the defendant’s companionship, is evidenced by the fact that Trelles took the defendant with him (paying all expenses) to night clubs and restaurants, to private clubs for daily and week-end recreations— even paying his membership fees at the New Orleans Athletic Club — and on extended trips to Hot Springs, California, Mexico, and Colorado. . Trelles, who’ had come to this country as a young immigrant from Spain, even taught Goesling to speak his native language. (Tr. 241.) At an early stage in their friendship, when the defendant in 1936 was in need of financial assistance in purchasing a car, Trelles signed' a continuing guarantee with the Louisiana Bank & Trust Company to cover his financial obligations with this bank, and the record of the defendant’s loan there discloses he never presumed upon or took undue advantage of his benefactor’s generosity in this respect. (This guarantee is in the record and though unnumbered is designated in the transcript at the time of its introduction as Louisiana Bank 1 and 2.) (Tr. 215-217.) When the, defendant’s car was *94 wrecked in South Carolina in March of 1939, Trelles again came to his assistance financially, depositing $800 to his bank account. (Tr. 310-312.) Still later, in February of 1942, after the defendant’s marriage to Ursula, and several years after the acquisition of the property involved in this case, Trelles gave the defendant cash in the amount of $1,664 (D-16, Tr. 317— 319) with which to purchase outright -a third car. If there is any truth to the plaintiff's story that the defendant had defrauded her by refusing in February of 1941 to transfer to her title to this property, I cannot believe that Mr. Trelles would have continued to shower his generosity on this defendant by giving him such a large sum of money in February of 1942.
During the six year period defendant was courting the plaintiff’s daughter, whom Trelles met for the first time in 1928 (Tr. 112) and had seen grow to young womanhood, Trelles and the defendant spoke many times of the defendant’s affection for Ursula, and as the defendant became more serious in his intentions with respect to her, the interest of Trelles in' their romance increased. On innumerable occasions Trelles showed a keen interest in the defendant’s plans for the future, particularly with respect to Ursula, and when the defendant informed Trelles that although he and Ursula were in love, he felt he could.not marry until he was in a position to offer her some measure of security. Trelles, relating the struggle he had had when he came to this country and explaining how much every favor had meant to his personal and mental 'satisfaction, as well as to his material welfare and ultimate success, generously offered to assist him in getting a start. In this the defendant is 'corroborated by Trelles. (See answer to Cross-interrogatory No. 30(y).)
Pursuant to his understanding with Trelles, the defendant, Ursula, and Trelles looked at a home on Palm street and Friedrichs avenue in Metairie with the view of buying it, and the defendant and Ursula looked at many other houses, including one on Audubon Boulevard that was seriously considered but turned down after a discussion with Trelles, because the defendant disliked certain features and also thought it would cost too much to repair. (Tr. 277.) It was at the suggestion of Trelles himself that the defendant decided to buy a lot and build a house. (Tr. 221.) His search for a lot was rewarded in the location of the one involved in this suit, then on the market for $6,000. When he showed the lot to Trelles one afternoon, Trelles told him he would make final arrangements to help the defendant if he was successful in getting the lot for less than the list price, suggesting that he make an offer of $4,500, which he did, but which was turned down. However, at the suggestion of the real estate ’ agent, and with the approval of Trelles, the defendant submitted another offer of $5,000 on May 8, 1939, agreeing to make a deposit of $500 *96 in the event the offer was accepted, and stipulating that the act of sale would he passed on or prior to June 15, 1939. (Tr. 107, 108.) In this he is corroborated fully, for the offer of May 8, 1939, is in the record. (D-3.) When the offer was accepted, Trelles, in accordance with their agreement, gave him the $500 in cash, and he deposited it in accordance with the offer of May 8 on May 12, 1939. (D-18.) (The plaintiff apparently knew nothing of all of this, for she neither demands an accounting of this deposit money nor testifies with respect thereto.)
Upon being apprised of the fact that the act of sale would be passed on June 6, 1939, the defendant met Trelles by appointment in front of the American Bank & Trust Company on June 5, 1939, and Trelles handed him a $6,000 bank exchange check which he (the defendant) immediately deposited to his own account in the Whitney Bank and against which he drew the following day when the title was formally transferred to him before Abner Northrop, notary public. In this he is corroborated by the bank records showing Trelles purchased this draft of June 5, 1939, for $6,000 (D-ll and D-12, by the draft itself (D-8), showing on the reverse side it was deposited in the Whitney Bank on the same day (Whitney I and D-9), by the act of sale (D-6), his personal check in the amount of $4,556.61 (D-17), and the formal statement covering the money involved in this transaction (D-22), which shows this check was for the balance of $4,500 due on the lot itself, and for the pro rata amount due on the taxes on the lot for 1939, in the amount of $56.61.
In the meanwhile, Trelles had received a personal invitation by mail to a “home” show at the auditorium, and he gave this invitation to the defendant with the suggestion that he attend and benefit from such ideas as they might have. In this the defendant is corroborated by the invitation addressed to Trelles, which he produced at the trial. (Tr. 104, 248, D-64.)
At this time the defendant and his intended bride had been looking at a number of houses with the view of determining the type to be constructed on the lot, and when they were taken to see the house at the corner of Burdette and South Claiborne by its builder, Bert Wilson, it was decided that an exact duplicate of this house should be built (Tr. 71), and the services of this contractor were, accordingly, engaged, formal contract being executed before Abner Northrop, notary public, on June 16, 1939 (D-5), wherein Wilson agreed to construct the house on this lot for the sum of $9,800, payable in six installments as the work progressed, thus corroborating the defendant’s testimony in these respects.
In order to meet these payments, and in accordance with a previous understanding the defendant had with Mr. Trelles, the latter caused to be deposited in the defendant’s account at the Whitney Bank, while the defendant was out of the city, a second *98 bank draft, in the amount of $4,000, pm-chased by Trelles on July 13, 1939. In this the defendant is fully corroborated by Exhibit D-ll, showing debit of this $4,000 amount from the bank account of Trelles on July 13; by D-13, showing the purchase .of the bank draft by Trelles; by D-10, the check itself; by Whitney II, a photostat of the original deposit slip showing this check was put in the defendant’s account at the Whitney Bank on July 13, 1939; by D-14, showing credit of this amount to the defendant’s account on July 13, 1939; by D-19, showing the defendant issued his personal check on July 14, 1939, in the amount of $2,855.18 payable to Bert Wilson and carrying the notation that this amount covered the first two payments due on the house at that time; and by D-15, showing the defendant was on that day in July in Shreveport, Louisiana.
To further corroborate his testimony that he had personally entered into these various contracts and was acting throughout the entire transaction in his own behalf ■ — and not, as testified to by the plaintiff and her daughter, as a nominal party, since the plaintiff had personally selected and drafted the plans, chosen the contractor, made the structural alterations later authorized in the plans, and ordered that the house be placed on this lot in accordance with her specific instructions— the defendant introduced the testimony of the contractor, Bert Wilson, a totally disinterested person, who testified unqualifiedly that his relationship in the execution of this contract, in the selection of the plans, and in the actual construction of the house had been directly with the defefidant and that he had taken no orders from the plaintiff or had any dealings with her. He denied Mrs. Devron had formulated' the plans for the house, stating the plans, had been drafted by him and were an exact duplicate in floor plan with the- house he had previously built. He denied there had been any structural changes in these plans,, with respect to the inside formation, as-sought to be established by the plaintiff,, stating that the only change made had been on the outside, in the front elevation, which the defendant did not like, and that he had, accordingly, submitted to Goesling two alternate front elevations, one of which the defendant decided on, and that the front had been constructed in accordance with the plan the defendant selected. In this the defendant is additionally corroborated by Ursula, who admitted this front change had been made because of Goes-ling’s dislike for the other. (Tr. 119.) Wilson further testified the house had not been located on the lot at the direction of the plaintiff, but in accordance with the city zoning restrictions, which restrictions were incorporated in and made a part of the act of sale of the lot. (D-6.) (Tr. 187-193.)
After the house was completed the defendant secured from the Prudential Insurance Company a loan of $9,000 and paid *100 the contractor the balance due for the construction. This loan, payable in monthly installments of $59.40, beginning January 4, 1940, was secured by a mortgage on the lot and house that was executed before Abner Northrop, notary public, on November 29, 1939. (D-7.)
There is, in addition, in the record proof showing the defendant paid the taxes due on the lot for the year 1939 (D-17 and D-22), as well as the taxes in 1941 (D-23); exhibits disclosing he paid the first insurance premium on the house, covering a three year period (D-25); that he applied for and was granted a homestead exemption in his own name and that there was, in fact, no tax due on the house itself for the reason that as an inducement to build, there was a forgiveness of these taxes for three years, which was one of the reasons why he, at Trelles’ suggestion, had decided to build instead of buy (Tr. 221-222) ; and that he paid the first four installments dtie on the mortgage loan, covering the months of January, February, March, and April of 1940, as will hereafter be demonstrated.
The defendant’s testimony with respect to these first four payments is not only substantiated by the plaintiff’s failure to produce any cancelled checks showing she made the payments during this period (her first check, dated April 30, 1940, obviously for the May payment since the payments were due in advance, is the 'earliest check produced — P 1-A), but is further corroborated by the fact that it is conclusively proved she did not, in fact, make two of these crucial first payments. Although she alleged and testified she paid these installments throughout all of the months from December of 1939 through July of 1945, the mortgage itself shows the first payment on the loan was not due until the month of January, 1940 (D-7), and the defendant proved he paid the March, 1940, installment. This is evidenced by his cancelled check D-57, and the photostat of his bank statement for that period showing the deduction of this $59.40 amount. (This exhibit is in the record but unnumbered.)
These facts, in my opinion, also fully corroborate the defendant’s testimony that in his original understanding with Mrs. Devron she, as a part of her rental agreement, was to pay to him the monthly amounts of $59.40; that she did so, and he, in turn, gent his personal check to the company; and that it was only at her suggestion (Tr. 82, — Mrs. Devron testifying thereafter does not deny this), when he was stationed in the East during 1940, that the mortgage loan book was turned over to her and she made these payments direct to the insurance company, as a matter of ' convenience only and to expedite the payments.
In the majority opinion much is made of the fact — indeed it would seem that ■ the opinion to a great extent actually rests upon this fact — that the plaintiff moved .into the house immediately upon its completion and that .the defendant did not *102 move into the house until November of 1940, over a year later. It is my opinion that this “coincidence” has been fully, reasonably, and logically explained, for it is conclusively established the defendant’s contemplated marriage to Ursula was postponed because of the serious illness of his mother, just then fatally stricken with cancer. That his marriage to Ursula was postponed several times is not disputed; in fact, the plaintiff so alleges in Article XI of her petition. ■ The defendant could hardly be expected to move into the house with Ursula before his marriage to her, and all the more-so since it was shown that from February of' 1940 to November of 1940 he was actually in New York.
That it was the defendant’s original intention to move into this house at the time of its completion-^-even as early as the plans were being discussed — is fully corroborated (1) by the fact that he took out the homestead exemption, just above mentioned, in his own name; (2) that he had the living room furniture Mrs. Devron was to move into the house from her old home reupholstered (D-56, Tr. 235); (3) that the water meter was installed in his name and he was billed for the amount due (D-23); and (4) that he furnished the house throughout with Venetian blinds before the plaintiff and her daughter moved in. (Tr. 236.) Additionally, as further evidence that it -was, from the first, contemplated the defendant, his bride, and his intended mother-in-law would occupy this house, and that this fact was known to all of the parties involved (including Mr. Trelles, who, in his usual generosity, furnished the money), the master bedroom set for the room to be occupied by the young couple upon their marriage, the dining room furniture, and other pieces for the house were purchased in the defendant’s name on October 2,1939. (D-53.)
Actually, the fact that it was contemplated from the very first that all of these people would occupy this house is not controverted. The only controversy is — who built the house. Ursula states that her mother agreed to live with them after the marriage because she (Ursula) was afraid to stay alone and the defendant was then on the road a great deal (this is the defendant’s testimony also), but that Mrs. Devron wanted it understood her mother and sisters would be welcome to ■ visit her, and' that when this was brought up, “Terry replied: ‘Well, Pud, we will build a house large enough so that two families can live in it.’ And the house was built that way.” (Tr. 117.) Mrs. Devron’s testimony is substantially the same with respect to this. She states that during their conferences and discussions Terry said: “Oh Pud * * * you know perfectly well I am on the road and Ursula will have to live with you. Why should WE maintain two homes?” stating, when she reminded him she wanted to be able to have her family visit her, “Well, LET’S build a house with three bedrooms.” (Tr. 147, 148.) (The emphasis and special *104 ■capitals have been added by me.) See, also, his testimony at Tr. 236 along this same line.
When the marriage between Ursula and the defendant was postponed, therefore, there was nothing unusual or unnatural about the fact that the plaintiff moved into the house in accordance with these prearranged plans, particularly when it had been completed and was standing ready for occupancy. Nor was there anything unreasonable or repugnant about the fact that in lieu of the rent for the first three months, since the mortgage payments were not due until January of 1940, Mrs. Devron agreed, as- testified by the defendant, to use equivalent funds for the landscaping of the small yard. (The record shows this three bedroom house, with garage, living and dining room, kitchen, two -baths, and sun parlor was built on a lot approximately 57x54x-120x141. D-3.) Nor can it be said that her agreement to pay, as part of her rent, the taxes and insurance that would become due in the future, is unbelievable, particularly if, as contended by the plaintiff, this house is worth $40,000, for if such is the case, $59.40 a month, plus these other expenses, would be indeed a minimum rent to pay.
In the majority opinion it is also stated that the conclusions reached by the trial judge in awarding this large money judgment are to be given much weight. If such is the case, I am at a loss to understand how, under any theory in reason or logic, the defendant can be compelled to pay for the telephone service, the water, the gas, and the lights that were used by the plaintiff and her daughter while they were occupying this house exclusively from October of 1939 to November of 1940 — a period of over a year — when it is admitted by everyone that the defendant did not even move into the house until November of 1940. By giving a judgment against this defendant for the telephone bills covering this period — amounting to $204.03 — the defendant is additionally being made to pay for something he is not under any conceivable theory obligated to pay, since the plaintiff herself, in her testimony, stated unequivocally he has already reimbursed her for all long distance calls he may have charged in reverse to her telephone during this period in calling Ursula while on the road. (Tr. 178.)
Pretennitting the fact that as a part of her rental agreement Mrs. Devron was to assume the expenses of gardening and landscaping, it is still harder for me to understand how the judge of the lower court could have awarded the plaintiff a judgment for these expenses in the amount of $458.53 on the strength of 17 checks produced by her showing she paid this amount to two New Orleans florists, E. A. Farley and William Kraak, from November of 1939 through August of 1942, when there is nothing in the record to show these expenditures actually covered gardening or landscaping at 5535 S. Claiborne Avenue, *106 she having introduced no itemized statements showing such to be the case and having failed to secure the testimony of these florists in corroboration — all the more particularly so when some of the notations •on these checks would indicate they were in payment of floral bills. Besides, one of these items — in the amount of $131.75 — was paid by two checks in October of 1941, at about the time the plaintiff built two cottages on her Mississippi Gulf Coast estate.
In this same vein, it is inconceivable to understand on what theory the plaintiff was .awarded judgment in the amount of $243.07 for insurance on this house, when it is shown that all she has done is throw into the record a number of checks totalling $420.76 and a statement in connection with this claim shows she was being billed for fire and tornado insurance on an automobile in the amount of $231.37 (P 5-1) and •exhibit P 5-G, in the amount of $81.09, shows this was one of the amounts paid on the automobile insurance.
The same is true of a claim of $116.23, ■covering supposed amounts paid to the Interstate Electric Company for fixtures when the evidence proves merely that in 1939 she paid this company the sum of :$56.86 and that in 1942 she paid this company $45.37 (which may well have been for her Mississippi improvements), totalling .$102.23, for there are no substantiating vouchers to show these were for fixtures .actually used on the property on S. Clai-Iborne Avenue, or that they were in payment of any item that was in any way of benefit to the defendant.
As to the amount she says she paid for taxes on this house, alleged in her petition to have been $1,876.35, and now claimed to amount to $221.66, the only proof introduced to substantiate such payment is a cancelled check dated June 24, 1941, in the amount of $77.60 (P 8-A) and another dated February 3, 1941, in the amount of $20.22 (P 8-B), totalling together $97.82. By no stretch of the imagination can these substantiate a claim for taxes in the amount of $221.66. The difference between these checks and the amount awarded is apparently represented by a tax bill for $123.84 in the name of Chas. T. Goesling covering taxes in 1945, showing it has been paid. However, there is absolutely nothing on or about this bill-receipt to show the plaintiff paid it and she has no corresponding cancelled check. (This is obviously one of the documents the plaintiff took with her when she left the house, as testified to by the defendant.) So far as this bare statement and receipt discloses, it was paid by the defendant himself.
And despite the fact that counsel for the plaintiff, when these exhibits were introduced during the trial, stated he was limiting all claims to the actual amounts represented by the checks (Tr. 158), I find that she has produced only 23 checks, totaling $1,438.55, to substantiate her original claim for mortgage payments made of $4,- *108 039.20, now reduced to $3,801.60 because of the disclosure during the trial that she had not made these payments in March, April, May, June, and July of 1945 — although she is given credit for having made the payment in March of 1940, that was conclusively paid by the defendant (D-57), as well as the payment in December of 1939, that was not paid by either the plaintiff or the defendant, because not then due.
While the author of the majority opinion was in a generous mood in dividing the cost of the gas, utilities and telephone services used at this house, even those incurred by Mrs. Devron and her daughter when they alone lived there (from October of 1939 to November of 1940), which total $509.62, I think it would have been most fair and equitable for him to extend his generosity further by dividing the monthly installments paid on the mortgage loan, particularly since the record unmistakably shows, she used this house for herself and her daughter exclusively for over a year prior to the defendant’s occupancy thereof, and that she thereafter shared the house with the defendant and his wife — to say nothing of the further fact that it is admitted by the plaintiff she lived in this house from March of 1945 until November of 1948 at the expense of the defendant, who was during this period paying all of the household expenses and loan payments. (Tr. 155.)
There are so many other discrepancies, contradictions, and questionable points in this record that could be pointed to to further discredit the plaintiff, and destroy any possible doubt that could conceivably remain as to the invalidity of her claim, that this dissent could well be twice this length. However, to bring the matter to a close as quickly as possible, I deem it advisable to discuss, though briefly, a few more important phases of the case that impart enlightenment on this entire situation.
The plaintiff not only failed to produce the documentary evidence necessary to substantiate her claim for the items just discussed, but she also failed to produce, although they were specifically subpoenaed by the defendant, any of the'records (or duplicate copies thereof) touching on the accounts she maintained in New Orleans, and Mississippi banks, as well as her income tax returns for the years 1940-1945. An examination of her testimony in explanation of her failure to produce any of these documents is so contradictory and evasive that, when considered together with the fact that she did produce a large number of checks dating back to 1939 and apparently meticulously ferreted out of her records, demonstrates that she was testifying falsely, and serves as an excellent example of the reason or basis for the rule-that failure to produce such documents, creates the presumption that they would be conclusive of the case against the person so failing to produce. Under the jurisprudence cited above, it is our duty to soj construe her actions.
*110 It may well be that these bank accounts and income tax returns, had they been produced, would have turned a strong light of revelation on many of the suspicious circumstances surrounding the case; would have brought into true focus many totally unexplained irregularities that have been sought to be submerged and obscured in a welter of evasions, half-truths, and innuendoes; and would have, in fact, foreclosed her claims.
For example, the plaintiff has not, in my estimation, satisfactorily explained why, if she was telling the truth, she caused the defendant to execute a $9,000 mortgage loan on this property after its completion when a balance of only $4,300 remained due, the record showing the house and lot cost $14,-800 ($5,000 for the lot and $9,800 for the house), and that of this amount Trelles advanced the sum of $10,500. It is possible these documents might -also explain why the plaintiff is not here asking the defendant for an accounting of this difference.
Actually, 1 cannot understand why Mrs. Devron should have had to borrow this amount at all if, as she testifies, she had, at the time, saved the sum of $7,000 (Tr. 181) which she later used to construct two cottages on a large tract purchased by her on the Mississippi Gulf Coast in 1933 for $4,000 — although she states she paid $1,500 of this amount with her pro- rata share of the proceeds of a house owned jointly by her and her sisters (and not with inherited funds as implied elsewhere), and the remainder at the rate of $50 a month, and that this entire amount was liquidated by 1934 or 1935, it is significant that this purchase was made the year after she allegedly began managing the Mississippi farm of Trelles on an expense basis — and on which property she had by 1941 already constructed (though she does not explain with what money) a residence, a po-st office, a garage, an oil station, and a grocery store. (Tr. 180-184.
In view of this, it may well be that these subpoenaed documents might throw some light on just what Mr. Trelles was trying to say when, in reply to plaintiff’s Interrogatory No. 14: “Please state whether or not in pursuance to such verbal arrangement you agreed to pay to Mrs. Devron in' the year 1939 the sum of $10,000,” he stated: "I don’t remember to paying that in 1939 or 1940. I remember that some amount something like that was paid.” -And when, in reply to the specific question in Interrogatory No. 25: “Did you not in April or May, 1939, turn over to Mrs. Lena Devron a cashier’s check drawn upon a New York Bank Exchange in the amount of $5,000.-00?” he said: “I don’t remember about making a check,” and when asked on cross-interrogatory to produce -such check .he replied : "There is no such thing. I can’t produce nothing.” And when in Interrogatory No. 27 he was again asked if in further pursuance to this alleged agreement' he turned over to Mrs. Devron another cashier’s check for $5,000 in October or Novem *112 ber of 1939, he replied: “I don’t remember that. I thought it was already by that time liquidated." (Emphasis has been added by me.)
The trend of the answers given by Mr. Trelles to this line of questioning clearly indicates that if he ever did have an agreement with Mrs. Devron that he would pay her for her services in connection with the farm, an amount other than expenses, that he gave her this money at a time other than the time or period involved in the transactions with this defendant.
In view of the foregoing, I do not think it unfair to assume that had Mrs. Devron, a woman with a working income ranging between $150 and $180 a month, on which she supported herself and her daughter, and, at the same time, entertained lavishly (according to her own testimony at Tr. 176), produced her bank accounts and income tax returns, they, coupled with these statements of Mr. Trelles, might well furnish the final threads needed to weave the complete pattern showing that her ability to acquire real estate of large value on the Gulf Coast (above described) was made possible only through Trelles’ largess to her. From his testimony it would certainly appear that he had apparently at some time other than the dates named in the questions addressed to him given her a “stipulated sum” in addition to the expense allowance and other generosities he had shown her.
Furthermore, it would appear to me that if any credence can be given the plaintiff’s story that the defendant was to transfer the property to her within six months after its construction, as alleged in her petition, and between three and six months according to her testimony, that she would not have waited more than a year before her first demand for such transfer. Testifying in particular with respect to these demands (which she stated generally had been made on several occasions), she said the first was made in February of 1940, but she immediately qualified this by stating it was after the defendant moved into the house, and inasmuch as he did not move there until November of 1940, after his marriage to Ursula, it is evident she never demanded he transfer the title until February of 1941 — more than a year and a half after its completion. (Tr. 161, 162.) Ursula, in an attempt to-corroborate, throws a great deal of light on these “demands” and actually substantiates the defendant’s version. She says the first time her mother demanded the transfer of this property was. shortly after they were married (Tr. 122),. which coincides exactly with the testimony of Mrs. Devron, explaining her mother-asked him to transfer the property because she was afraid something would happen to -him on the road and cause a lot of legal procedure, and that “he refused” to make the transfer. Testifying further as. to “one occasion,” without pinpointing it *114 any more definitely, (but which was apparently in reference to the conversation at the time of this first demand), Ursula stated he "again refused”, and that in order to prevent his family from inheriting any interest in the property and to protect her (Ursula) he sat down and wrote an olographic will, stating that as far as turning the home over to her mother was concerned, "that was out.”
The defendant’s testimony is that he gave the will to Ursula. Ursula corroborates him, for she says he gave her the will, then adds : “ * * * I don’t know what he did with it.” The plaintiff in her petition states the defendant gave the will to “her,” the inference not being clear as to whether the reference is to herself or her daughter, but the conclusion is inescapable that it was given to one or the other, and neither of them has produced it. The disposition of this will may appear on the surface to be a minor and trivial detail, but its importance becomes apparent when it is remembered that the will, if produced, would serve to show the actual date on which this first conversation with respect to a change in the title to the property occurred. That it would have been in corroboration of the defendant is apparent, for had it been in corroboration of the plaintiff, it would undoubtedly have been produced ¡by the mother or the daughter.
All of the foregoing is in full corroboration of the defendant’s answer to the petition, in which he avers the only suggestion made to him with respect to changing title to the property, other than the time when formal demand was made in November of 1948, at which time he ordered the plaintiff from the house, was before the birth of his child, and that he at that time made an olographic will leaving everything to Ursula. Under cross-examination under the act (Tr. 89) he explains this by stating that the making of the will occurred immediately after his mother’s death in 1941, when Mrs. Devron asked him, because of her dislike for his father and her fear that he might share in the defendant’s estate, to put the title “in three names of myself, my wife, and her name, just as a precaution,” but that he refused, stating, however, that in order to protect his wife he would make out a will leaving the property to her, which he did. This is not rebutted by either the plaintiff or her daughter, although both followed him on the witness stand after this testimony. They were not' even asked if his testimony in this respect was correct.
Other than the formal demand of November, 1948, which is admitted by all three parties, the only other date on which Mrs. Devron sought to establish she demanded the transfer of this property has reference to July of 1945, at which time, she says, “he absolutely refused.” (Tr. 155.) She gives none of the details with respect to this demand, explaining only (Tr. 162) that his attitude at this time was her reason for refusing to continue to make these mort *116 gage payments. (Yet the record establishes she made nq payments after February of 1945.) She had previously alleged she did nothing about enforcing her demand through legal procedure because she did not want to1 cause dissension in the home, but in testifying with respect to- this July, 1945, demand, she makes it clear the marriage was even then at the breaking point. She not only took no legal steps at this time despite the fact she knew positively the defendant was not going to transfer the house to her, but, in fact, she made no other demand until November of 1948, more than three years later.
She has no corroboration with respect to this 1945 demand. Ursula does not even sustain her in this respect. The record establishes the real cause of the trouble at this time was not a demand for the transfer of the house, but Mrs. Devron’s failure to continue making the rental payments in accordance with the agreement under which she was living in the house. The defendant, testifying with respect to these events, stated he unexpectedly left the house late one morning and found in the mail a letter addressed to him by the insurance company demanding payment on the loan installments, no payments having at that time been made for several months. He states, when examined under the act, that at this time he “hit the Ceiling, and my wife even dove into her in anger” (Tr. 85) and that he remonstrated with Mrs. Devron. On direct examination he further explains that “at that particular time, my wife was at home, and my wife became very angry also, and she and her mother went what we called then, went the rounds, in some heated arguments because she had failed to do* so” (Tr. 221), and that it was this failure of Mrs. Devron to.live up to her rental agreement that caused him to take over the payments on the mortgage note, which he has continued to pay ever since. These facts are also tacitly admitted to be true by the plaintiff’s failure to rebut them.
But to me the most significant and damaging evidence in the entire record lies in the fact that although Mr. Trelles was, according to the plaintiff and her daughter, cognizant of all of the underlying agreements and understandings with respect to the defendant’s transfer of the property to the plaintiff, and although Mr. Trelles knew the defendant was to act as a nominal party since he, as a man, was better able to handle the matter — this despite the fact that she was an experienced business woman, capable of managing a farm for 6 years and of building extensive property on the Coast without assistance, and the defendant, being on the road, had little chance to actually supervise the construction of this house— and was to transfer the property to her after its completion, it is passing strange that in all of the years intervening between September of 1939 and Mr. Trelles’ illness in 1945, although he was an almost daily visitor to the house, the plaintiff never once .placed the defendant’s refusal to transfer the property before him or called upon him *118 to assist her by coercing the defendant to carry out his obligation, or by forcing him to give her at least some tangible written proof, such as a counter letter, for her protection. (In fact, if such was the understanding, it is reasonable to assume Trelles, an astute business man, and also president of the Hi-Grade Realty Company when this transaction was confected, would have compelled the defendant to execute such a counter letter at the time the lot was purchased and the house built.)
In the light of Mr. Trelles’ testimony on this phase of the case, I feel it is understandable why she did not seek his aid in protecting her supposed claims. Trelles, in answer to plaintiff’s Interrogatory No. 16: “Did you in the year 1939 suggest -to the said Mrs. Lena Devron that the $10,000 should be invested in the purchase of a home?” he replied: “No, I don’t remember that.” When asked: “Did you at any time in the year 1939 have any discussions with the said Charles Thereon Goesling pertaining to the investment of the $10,000 in a home for Mrs. Devron?” (Interrogatory No. 20), he replied: “I don’t remember that.” And again, when asked in Interrogatory No. 21: “Did the said Charles Thereon Goesling at any time state to you in the presence of Mrs. Devron that a vacant lot be purchased on 'South Claiborne Avenue and that a house be built thereon?” he replied: “I don’t know none of this.” (Emphasis has been added by me.)
Still another enlightening feature of this case lies in the episodes leading to the only formal demand for transfer of this property, which occurred in November of 1948. The defendant testifies that in June of 1948, following a heated family dispute during which his mother-in-law and wife beat him up, his wife went to see an attorney and learned for the first time that this was his separate property and she had no interest therein. There immediately began a series of incidents and a course of conduct calculated to force him to leave the house, culminating in the presentation to him, in November of 1948, of a contract prepared by an attorney at the request of the plaintiff and according to the terms of which he would formally agree to transfer title to this property to. the plaintiff (P-17) in exchange for the plaintiff getting her daughter to sign a companion agreement with the defendant offering to settle their marital differences by formal contract. (P-18.) Thereupon, his patience reached the breaking point and he ordered the plaintiff to leave the house. Mrs. Devron did move out and move all of the furniture, but after a reconciliation of sorts with his wife, and his payment to her of some money, the furniture was moved back into the house and a portion of it sold to him, but it was again moved out in January of 1949 when his wife left him, and that this suit was instituted the following April.
With this record before, me, I cannot close my eyes and blindly say it is my be *120 lief this house was really intended for the plaintiff. Nor can I in good conscience, based on nothing more than a supposition of such an intention, condemn the defendant for the theft of this house, and thus further crucify him by adding a large judgment, the payment of which will, in my opinion, have the effect of ultimately wiping out the home the plaintiff has already broken up.
I therefore respectfully dissent.